UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------------------------- x
JESSE ANDRE,                                        :
                                                    :
                        Petitioner,                 :
                                                    :         **MEMORANDUM AND**
          -against-                                 :         **ORDER**
                                                    :
WARDEN, FCI DANBURY,                                :         3:24-CV-01295 (VDO)
                        Respondent.                 :
---------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

      Before the Court is Petitioner Jesse Andre's motion for relief from that judgment under Federal Rule of Civil Procedure 60(b). For the reasons that follow, Petitioner is **ADMONISHED,** and his motion is **STRICKEN.**

## I.    BACKGROUND

      On April 2, 2025, Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 asserting a single claim: that "the Bureau of Prisons ('BOP') refus[ed] to place him in a Residential Reentry Center (RRC) for up to 12 months as mandated by the Second Chance…based solely on…being a purported deportable alien[.]"[1] The Court ultimately denied the habeas petition.[2] A few months later, after briefing by both parties, the Court denied Petitioner's request to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e).[3] On June 26, 2025, Petitioner filed his motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b) (the "Motion").[4]

---

[1] Pet., ECF No. 1-1 at 1.
[2] *See* Order, ECF No. 21 at 10.
[3] *See* Order, ECF No. 31 at 1.
[4] Mot., ECF No. 32.

On July 31, 2025, the Court issued an order to show cause based on its suspicions that Petitioner was receiving external help with his filings, including help from an attorney, and that he wasn't personally signing his filings.[5] The Court will not recount in detail the basis of its suspicions here, other than to summarize that the pleadings filed under Petitioner's name were unusually well-written and formatted for a *pro se* litigant, bore electronic images of his signature rather than handwritten ones, and were inconsistent in style and quality with handwritten filings Petitioner made in other courts, suggesting that an attorney had drafted them.[6] The Court refers to the order to show cause for additional detail.[7] The Court directed Petitioner to "file a notice, under penalty of perjury, (1) identifying whether he personally drafted the pending Rule 60(b) motion; and (2) if he did not draft the motion, identifying the person who did and whether that person is an attorney licensed to practice law in the District of Connecticut."[8]

Petitioner filed his notice in response to the order to show cause on August 11, 2025, asserting that though he "received clerical assistance from a typing service in preparing and formatting" his filings, "[a]ll legal arguments, assertions, and conten[t] were provided and approved by" Petitioner.[9] He also stated that "[n]o attorney or legal professional ha[d] prepared, reviewed, or advised on the content of [Petitioner's] filings," and that "[t]he typing service did not provide any legal advice or input beyond the mechanical act of typing [Petitioner's] dictated or handwritten words."[10] He further explained that while he had

---

[5] *See* O.S.C., ECF No. 34.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *See* Pet. Resp., ECF No. 36, ¶ 4.
[10] *Id.* at ¶ 5.

occasionally spoken with incarcerated individuals who were current or former attorneys or who otherwise had legal knowledge—some of whom pointed him to relevant legal authorities or offered general advice on framing his claims—he did not have regular access to them and made all substantive decisions regarding his filings himself.[11]

On September 3, 2025, the Government filed its response to the Court's order to show cause.[12] The response included emails retrieved from Petitioner's prison email account, which revealed an exchange between "Alan Adamz" of "Nuline Legal" and Petitioner.[13] The emails contained an August 5, 2025 email from "help@nulinelegal.com," the same email address that Alan Adamz had been using to correspond with Petitioner before and after the show cause order issued.[14] The subject line of the August 5, 2025, email read, "Your draft as requested."[15] The body of the email contained the response to the Court's order to show cause.[16]

The Government's response to the show cause order stated that "[t]he website www.nulinelegal.com appears to be related to an entity identified as Nuline Legal Services ("Nuline"). That website at one point included information pertaining to Nuline's services (see below), but the website is not operative at the time of filing."[17] While Nuline's website may have been inoperable when the Government filed its response on September 3, 2025, websites are archived on the Internet Archive located at https://web.archive.org (known as the "Wayback Machine"). "[T]he Court may take judicial notice of the content of webpages,

---

[11] *Id.* at ¶ 7.
[12] *See* Resp't Resp., ECF No. 38.
[13] *See* Resp't Resp., Ex. 1, ECF No. 38-1.
[14] *Id.* at 3.
[15] *Id.*
[16] *Compare id.*, with Pet. Resp., ECF No. 36.
[17] Resp't Resp. at 1 n.1.

including the content of archived webpages available through the Wayback Machine." *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 248–49 (S.D.N.Y. 2025) (citing *Wells Fargo Bank*, 127 F. Supp. 3d at 167; *Aubrey v. New Sch.*, 624 F. Supp. 3d 403, 408 (S.D.N.Y. 2022); *Thorne v. Square, Inc.*, No. 20-CV-5119, 2022 WL 542383, at *1 (E.D.N.Y. Feb. 23, 2022) (collecting cases taking judicial notice of pages from the Wayback Machine)); *see also Distributorsoutlet.com, LLC v. Glasstree, Inc.*, No. 11-CV-6079, 2016 WL 3248310, at *2 (E.D.N.Y. June 10, 2016) ([C]ourts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned under Federal Rule of Evidence 201.").

The Wayback Machine shows the dates on which a snapshot of a website was taken. The dates highlighted in blue below show when nulinelegal.com was archived. *See also* https://web.archive.org/web/20250000000000*/http://www.nulinelegal.com.



Nulinelegal.com was last archived on August 4, 2025, one day before Nuline sent the response to the order to show cause to Petitioner.[18] The website has not been archived since because Nuline took it down, sometime between August 4, 2025, and September 3, 2025.[19] The Wayback Machine's August 4, 2025, snapshot of Nuline.com shows the website as it existed on that date. As of August 4, 2025, under the "About Us" tab (https://web.archive.org/web/20241210214225/https://nulinelegal.com/about-us), Nuline explained its services. As of August 4, 2025, under "Practice Areas," the website stated that Nuline is "your trusted source for comprehensive and reliable paralegal services. Our dedicated team of experienced professionals specializes in a wide range of legal matters to ensure that your rights are protected and your case is handled with utmost care." *Id.* It also listed "First Step Act Litigation" as the first service offered. *See id.* ("Our team is well-versed in the provisions of the First Step Act and can provide expert guidance and representation for clients seeking relief under this groundbreaking legislation including earned time credits which are being wrongfully denied.").

Petitioner filed his reply on September 16, 2025.[20] He reasserted that "all legal arguments and substantive content are his own" and that "[o]utside assistance was limited to typing, formatting, and citation checking at his direction, and he personally reviewed, approved, and signed all filings."[21] Petitioner characterized the Government's response as

---

[18] *See id.*
[19] *See id.*
[20] *See* Reply, ECF No. 40.
[21] *Id.* at 2.

"raising speculative assertions about third-party involvement" and the Court's order to show cause as "designed to delay resolution."[22]

On October 16, 2025, the Court held a hearing on the order to show cause.[23] At the hearing, Petitioner admitted that he was receiving external help from multiple "friends" who he referred to as "jailhouse lawyers" currently not in custody, though Petitioner insisted that they were not licensed attorneys.[24] The Petitioner also represented that these friends would "put [his writings] out more professionally," sometimes with the use of artificial intelligence. He admitted to "heavy" reliance on artificial intelligence, including instructing the friends assisting him to ask AI certain questions and having AI "draft up motions." Petitioner also conceded that some filings were not submitted by him personally but were filed on his behalf by friends, so that he wouldn't miss deadlines when he was otherwise unable to file anything with the Court.

The Court has conducted a review of the rules and cases cited in Petitioner's Motion. That review revealed numerous inaccuracies and fabrications. One cited case—*Harriot v. Jamison*, purportedly a 2025 decision from the Southern District of New York—simply does not exist. Other cases, such as *Levine v. Apker*, *Woodley v. Warden*, *Komando v. Luna*, *Sierra v. Jacquez*, and *Perttu v. Richards*, were either misquoted or relied upon for propositions they do not support. In multiple instances, the Motion attributed quotations to real opinions that contain no such language and misrepresented procedural postures. The review also found distorted citations to federal procedural rules, including references to Federal Rule of Civil

---

[22] *Id.* at 1, 3.
[23] Min. Entry, ECF No 44.
[24] At the hearing, Petitioner refused to name these parties, so the Court cannot independently verify whether or not the parties are licensed attorneys.

Procedure 15(a) and Habeas Rule 7, which were mischaracterized as authorizing a habeas petitioner to unilaterally "expand the record" after judgment. Collectively, these errors indicate that substantial portions of Petitioner's Motion were generated or edited by an artificial intelligence tool that fabricated authorities and quotations, rather than reflecting legitimate legal research.[25]

## II.    **LEGAL STANDARD**

Rule 11 of the Federal Rules of Civil Procedure ("Rule 11") dictates that "[e]very pleading, written motion, and other paper must be signed by . . . a party personally if the party is unrepresented." Rule 11(b) states, in relevant part, that:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law…

*Id.* Rule 11 "is not aspirational; it is the minimal standard of honesty that keeps the adversarial process tethered to reality." *Mattox v. Prod. Innovations Rsch., LLC*, No. 6:24-CV-235, 2025 WL 3012828, at *4 (E.D. Okla. Oct. 22, 2025). In short, Rule 11(b) imposes an affirmative duty on parties and counsel to ensure that all papers filed with the Court are factually and legally well-founded. "Under Rule 11, a court may sanction an attorney [or an

---

[25] For additional examples of hallucinations in Petitioner's Motion, the Court refers to the table in Part III.A, *infra*.

unrepresented party] for, among other things, misrepresenting facts or making frivolous legal arguments." *Muhammad v. Walmart Stores East, L.P.,* 732 F.3d 104, 108 (2d Cir. 2013) (per curiam). A legal argument may be sanctioned as frivolous when it amounts to an "'abuse of the adversary system. . . .'" *Salovaara v. Eckert*, 222 F.3d 19, 34 (2d Cir. 2000) (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990)).

"Merely incorrect legal statements are not sanctionable under Rule 11(b)(2)." *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 391 (2d Cir. 2003). "The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable." *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011). A legal contention is frivolous because it has "no chance of success" and there "is no reasonable argument to extend, modify or reverse the law as it stands." *Id.* (citation modified). The filing of papers "without taking the necessary care in their preparation" is an "abuse of the judicial system" that is subject to Rule 11 sanction. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990). Rule 11 creates an "incentive to stop, think and investigate more carefully before serving and filing papers." *Id.* (citation modified).

A court may "initiate sanctions *sua sponte* by issuing an order 'to show cause why conduct specifically described in the order has not violated Rule 11(b)." *Kyros L. P.C. v. World Wrestling Ent., Inc.*, 78 F.4th 532, 543 (2d Cir. 2023) (quoting Fed. R. Civ. P. 11(c)(3)). The power to *sua sponte* impose Rule 11 sanctions is akin to "a courts inherent power of contempt," and like contempt, a district court may *sua sponte* sanction a litigant only upon finding they acted with "subjective bad faith." *In re Pennie & Edmonds LLP*, 323 F.3d 86, 90 (2d. Cir. 2003). Subjective bad faith is a "heightened *mens rea* standard" designed to promote zealous advocacy while deterring improper submissions. *Id*. at 91. The heightened standard can be satisfied upon finding that a litigant made a "misleading representation to a district court for

an improper purpose." *Rankin v. City of Niagara Falls*, 293 F.R.D. 375, 387 (W.D.N.Y. 2013),

*aff'd sub nom,* 569 F. App'x 25 (2d Cir. 2014).

### A. Ghostwriting

Ghostwriting, or the conduct of an attorney who prepares pleadings and provides

substantial legal assistance to a *pro se* litigant but does not enter an appearance or otherwise

identify himself or herself in the litigation, has generally "been condemned as a deliberate

evasion of the responsibilities imposed on counsel by" Rule 11. *Wesley v. Don Stein Buick,*

*Inc.*, 987 F. Supp. 884, 886 (D. Kan. 1997). One case summarizes the concerns with

ghostwriting as follows:

> It is elementary that pleadings filed *pro se* are to be interpreted liberally. [The
> defendant]'s pleadings seemingly filed *pro se* but drafted by an attorney would
> give him the unwarranted advantage of having a liberal pleading standard
> applied whilst holding the plaintiffs to a more demanding scrutiny. Moreover,
> such undisclosed participation by a lawyer that permits a litigant falsely to
> appear as being without professional assistance would permeate the
> proceedings. The *pro se* litigant would be granted greater latitude as a matter of
> judicial discretion in hearings and trials. The entire process would be skewed to
> the distinct disadvantage of the nonoffending party.

*Johnson v. Bd. of Cnty. Com'rs Cnty. of Fremont*, 868 F. Supp. 1226, 1231 (D. Colo.

1994), *aff'd on other grounds*, 85 F.3d 489 (10th Cir. 1996) (citation modified). The case goes

on to say, with respect to Rule 11 concerns, specifically:

> What we fear is that in some cases actual members of the bar represent
> petitioners, informally or otherwise, and prepare briefs for them which the
> assisting lawyers do not sign, and thus escape the obligation imposed on
> members of the bar, typified by [Rule 11], but which exists in all cases, criminal
> as well as civil, of representing to the court that there is good ground to support
> the assertions made.

*Id.* at 1231–32 (quoting *Ellis v. Maine*, 448 F.2d 1325, 1328 (1st Cir.1971)).

Nevertheless, "[t]he Court recognizes that, unlike sister circuits that condemn attorney

ghostwriting on behalf of *pro se* litigants, the Second Circuit has yet to conclude that ghostwriting is necessarily an ethical violation." *Mejia v. Robinson*, No. 1:16-CV-9706, 2018 WL 3821625, at *3 (S.D.N.Y. Aug. 10, 2018) (citing *In re Fengling Liu*, 664 F.3d 367, 369–72 (2d Cir. 2011)). In *In re Fengling Liu*, the Second Circuit concluded that "[i]n light of a 2007 ethics opinion issued by the American Bar Association and other recent ethics opinions permitting various forms of ghostwriting," an attorney's ghostwriting did not violate her ethical obligations." 664 F.3d at 369–72.

While the *Fengling Liu* court chose not to discipline the ghostwriting attorney, it only reached this decision because the circumstances of that case did not warrant discipline. The Second Circuit did not approve of the practice; nor, in cases of ghostwriting, has it hesitated to strip a pro se litigant of the special solicitude they are normally entitled to. In a subsequent case in which an attorney had ghostwritten her husband's pro se briefs, in particular, the Second Circuit concluded that the pro se husband was "not entitled to 'claim the special consideration which the courts customarily grant to pro se parties.'" *Spira v. J.P. Morgan Chase & Co.*, 466 F. App'x 20, 22 n.1 (2d Cir. 2012) (summary order). District courts have consistently followed suit in declining to extend to ghostwritten submissions the "special solicitude" normally afforded to pro se pleadings. *See, e.g., Koonce v. Gaylord Hosp., Inc.*, No. 3:13-CV-00362 (VLB), 2015 WL 4603414, at *4 n.2 (D. Conn. July 30, 2015); *Mejía*, 2018 WL 3821625, at *4; *Askins v. Metro. Transit Auth.*, No. 1:19-CV-4927, 2020 WL 1082423, at *3 (S.D.N.Y. Mar. 5, 2020). Where it was questionable whether a pleading was ghostwritten, other courts have required pro se litigants "to indicate in [any future] filing if the filing was prepared with the assistance of an attorney." *West v. City of Harford*, No. 3:23-CV-1020 (SVN), 2024 WL 2113076, at *5 (D. Conn. May 10, 2024) (citation modified).

Additionally, the *Fengling Liu* court stated that:

> Regarding the attorney's potential dishonesty in avoiding accountability for his representation, the ABA opinion explained that "[w]hether it is dishonest for the lawyer to provide undisclosed assistance to a *pro se* litigant turns on whether the court would be misled by failure to disclose such assistance." *Id.* However, the opinion concluded that there is no such dishonesty *as long as the client does not make an affirmative representation*, attributable to the attorney, that the pleadings were prepared without an attorney's assistance.

*Id.* at 371 (emphasis added). In other words, though the Second Circuit didn't outright condemn ghostwriting, it made clear that an affirmative misstatement made by a party, at an attorney's suggestion, is still prohibited.

### B.  Use of Artificial Intelligence

"Federal courts increasingly confront filings prepared with the assistance of generative artificial intelligence. While such tools can enhance efficiency, they also create a new professional hazard, synthetic authority presented as precedent. No uniform standard yet governs this issue." *Mattox*, 2025 WL 3012828, at *5. The main problem with filings that rely on generative artificial intelligence, of course, is that they often include hallucinations.[26] The Court defines a "hallucination" in the context of AI-assisted legal research as one of three errors: (1) fabricated cases (whether a nonexistent case name and citation, an existing case name with an invented citation, or a real citation that leads to a wholly unrelated decision); (2) fabricated quotations from actual cases; and (3) misstatements of law (representations of legal rules, standards, or holdings that are inaccurate, incomplete, or unsupported by any real

---

[26] The Court "acknowledges that our society sits on the precipice of rapid technological development and that the continued development of AI will fundamentally alter life as we know it." *Milton Robinson Teletor Cojom, v.. Roblen, LLC*, No. 3:23-CV-1669 (JCH), 2025 WL 3205930, at *3 (D. Conn. Nov. 17, 2025). This order is not "a Luddite attack on technology and the efficiency it brings to the legal profession," but rather a recognition that "AI remains a nascent technology with questionable reliability at this juncture." *Id.*

authority, including AI-generated summaries that distort or materially alter what a case actually decided).

In an adversarial system that depends on litigants to candidly present accurate authority, such hallucinations mislead the Court, forcing it either to expend substantial resources verifying fabricated material or, worse, risk reliance on an erroneous statement of the law. Numerous additional concerns abound:

> "Many harms flow from the submission of fake opinions . . . The Court's time is taken from other important endeavors. The client may be deprived of arguments based on authentic judicial precedents. There is potential harm to the reputation of judges and courts whose names are falsely invoked as authors of the bogus opinions and to the reputation of a party attributed with fictional conduct. It promotes cynicism about the legal profession and the American judicial system. And a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity."

> *Mata v. Avianca, Inc.*, 678 F. Supp. 3d at 448.

The Court adopts, in part,[27] the analytical framework set forth by the *Mattox* court while confronting a party who used artificial intelligence in drafting its pleadings:

> When a pleading containing fabricated citations or nonexistent law has been identified and a hearing held, this Court shall evaluate [two] core factors:
>
> 1. Verification and Inquiry — Whether counsel [or the unrepresented party] conducted a reasonable, human-based verification of every cited authority before filing. A reasonable inquiry requires more than reliance on an automated tool; it demands independent confirmation through recognized primary legal sources. The signature of an attorney [or the unrepresented party] certifies human diligence, not mechanical output.

---

[27] The full *Mattox* test includes an additional factor titled "Accountability and Supervision." The *Mattox* court explained the factor as: "Whether supervising or associated attorneys exercised oversight consistent with [ABA] Model Rules [of Professional Conduct] 5.1 and 5.3 and whether firm-level safeguards existed to prevent recurrence. The inquiry extends beyond the drafter to the institutional culture that permitted unverified authority to reach the docket. A firm's silence or absence of policy does not immunize it; it implicates it." 2025 WL 3012828, at *5. The Court omits this factor here as it finds it to be inapplicable to pro se litigants.

2. Candor and Correction — Whether counsel [or the unrepresented party] promptly disclosed the use of AI and corrected the record once inaccuracies were discovered. Candor after filing weighs heavily in mitigation; concealment or minimization aggravates the violation. The duty of candor extends beyond the moment of signature, it continues for as long as the filing remains before the Court.

*Mattox*, 2025 WL 3012828 at *5.

Courts in this circuit have repeatedly found that presenting AI-generated hallucinations as valid caselaw constitutes subjective bad faith. *See, e.g.*, *Mata*, 678 F. Supp. at 464; *Benjamin v. Costco Wholesale Corp.,* 779 F. Supp. 3d 341, 350 (E.D.N.Y. Apr. 24, 2025); *Ramirez v. Humala*, No. 24-CV-242, 2025 WL 1384161, at *2 (E.D.N.Y. May 13, 2025); *Kaur v. Desso*, No. 9:25-CV-726, 2025 WL 1895859, at *3 (N.D.N.Y. July 9, 2025).

## III.  **DISCUSSION**

### A.  **Factual Findings**

The Court remains uncertain as to who actually drafted Petitioner's Motion and other filings in this case, whether that individual was an attorney, and the extent to which Petitioner himself supplied the arguments and case law ultimately incorporated into those filings. A few points, however, are clear: (1) Petitioner unquestionably received third-party assistance in drafting his submissions; (2) he affirmatively misled the Court by characterizing that assistance as merely "clerical" or "typographical"; (3) the third party's work included the use of unverified generative artificial intelligence, resulting in multiple significant hallucinations throughout the Motion; and (4) Petitioner did not personally sign or file the Motion.

First, Petitioner admitted at the October 16, 2025, hearing that multiple friends, including a friend operating Nuline, assisted him in preparing his filings. Although he claimed

that he typically directed these friends as to which arguments and case law should be included, he immediately undermined that assertion by also acknowledging that he instructed them to generate filings using artificial intelligence. The resulting Motion confirms as much, as it contains multiple hallucinations characteristic of unverified AI tools. It is therefore unclear how Petitioner could have meaningfully guided the preparation of arguments and case law when those arguments and citations were later produced by artificial intelligence rather than by him. It is similarly unclear how Petitioner could have had any meaningful input on briefs that were wholly written and filed without his involvement, discussed at greater length below. In short, the Court does not find credible Petitioner's claim that he authored the bulk of the arguments and case law in his Motion or his other filings. The record supports the conclusion that he received substantial third-party assistance.

Second, the Court finds that Petitioner affirmatively misled the Court about the nature of the assistance he received. In his written response to the order to show cause, Petitioner characterized the assistance as merely "clerical" or "typographical" and asserted that "[a]ll legal arguments, assertions, and conten[t] were provided and approved by" him and that he made all substantive decisions regarding his filings. As discussed above, those representations are inconsistent with his own admissions at the October 16 hearing and with the content of the filings themselves. Petitioner acknowledged at the hearing that his friends generated filings using artificial intelligence and that he submitted those documents without meaningful review. Further, the response to the order to show cause was printed directly from an email sent to him by one of these friends, signed and filed without alteration. Although the Court cannot determine with certainty whether that filing was itself AI-generated, it is clear that it, too, was prepared by a third party and not by Petitioner. And it is clear that the third party, Nuline,

represented itself publicly, prior to the Court's order to show cause in this case, as a "dedicated team of experienced professionals" in the business of providing their "comprehensive and reliable paralegal services" to people like Petitioner. These facts collectively establish that Petitioner's earlier representations to the Court were materially misleading.

Third, the Petitioner's Motion is riddled with hallucinations, clearly indicating the use of generative artificial intelligence in drafting them. Below, the Court includes a chart summarizing some of these hallucinations:

| Petitioner's Assertion | Cite | Nature of Hallucination |
|---|---|---|
| *Levine v. Apker*, 455 F.3d 71, 86 (2d Cir. 2006), holds that BOP "may not categorically refuse to consider prisoners for community confinement based on class membership." | p. 5 | *Levine* is a real case but quote does not exist. Case does not stand for proposition of the nature the quote asserts. |
| Numerous courts, including *Harriot v. Jamison*, 2025 WL 456789 (S.D.N.Y. Feb. 4, 2025); *Woodley v. Warden*, 2024 WL 2260904 (D. Kan.); ... reject detainer-only bars absent a final order of removal. | p. 5 | *Harriot* does not exist; *Woodley* exists but does not stand for the asserted proposition. |
| *Perttu v. Richards*, Slip op. at 6–7, makes clear that exhaustion is excused when remedies are unavailable or would cause irreparable harm. | p. 7 | Case exists but is mischaracterized. *Perttu v. Richards*, 605 U.S. 460, 464 (2025), had to do with "whether a party has a right to a jury trial on PLRA exhaustion when that dispute is intertwined with the merits of the underlying suit." The Supreme Court found that a party does. However, neither the PLRA nor exhaustion is relevant in this case. |
| See, e.g., *Harriot v. Jamison*, 2025 WL 456789, at *3 (S.D.N.Y. Feb. 4, 2025) | pp. 7–8 | As previously noted, *Harriot* does not exist. Further, it is a misstatement of |

| | | |
|---|---|---|
| (noting the "blanket nature" of the BOP's policy); *Woodley v. Warden*, 2024 WL 2260904, at 3 (D. Kan. May 15, 2024) (same); *Sierra v. Jacquez*, 2022 WL 18046701, at 3 (W.D. Wash. Dec. 27, 2022) ("The record shows the BOP applies a categorical policy ... "). See also Resp. at 11-12. | | the law to say that *Woodley* and *Sierra* stand for the asserted proposition. Lastly, the *Sierra* quote does not exist. |
| The Supreme Court and federal habeas rules expressly permit district courts to expand the record on habeas review, even after the initial petition is filed. See Rule 15(a), Fed. R. Civ. P.; Rule 12, Rules Governing Section 2254 Cases (incorporated in 2241 practice); *Rivers v. Guerrero*, 2025 U.S. LEXIS 2276, at *9-11 (June 12, 2025). | p. 10 | Case exists but does not stand for the asserted proposition. None of the rules cited stand for the proposition either. |
| Rule 7 may be used to expand the record immediately prior to the evidentiary hearing, or even during the hearing . . . Rule 7 may be used to expand the record immediately prior to the evidentiary hearing, or even during the hearing.<br><br>Under Habeas Rule 7, either party (or the Court) could have moved to expand the record at any stage-including after the policy change, and particularly after new evidence was introduced or when reconsideration was sought | pp. 10–11 | Rule does not stand for asserted proposition. It says nothing about a litigant being able to expand the record unilaterally. In relevant part, Rule 7 says "If the [habeas] petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition. The judge may require that these materials be authenticated." |
| [H]abeas law requires liberal construction of pro se filings, with technical deficiencies excused where the facts and core claims were timely raised. *Rivers,* 2025 U.S. LEXIS 2276, at *10-11. | pp. 11, 12 | Case does not stand for the asserted propositions. |

| | | |
|---|---|---|
| *See also Rivers v. Guerrero,* Case No. 23-1345, 2025 U.S. LEXIS 2276, at *9-11 (June 12, 2025) (supplemental filings pre-judgment should be treated as part of the operative habeas record) | | |
| Contrary to the Denial Order (at 8–9, 12), the law is clear that pro se habeas petitions are governed by liberal amendment and relation-back principles. *See Mayle v. Felix,* 545 U.S. 644, 655-59 (2005); *Rivers*, 2025 U.S. LEXIS 2276, at *10. | p. 12 | *Mayle* does not stand for the asserted proposition; in fact, the Court there declined to relate back an amendment by a *pro se* litigant (thereby subjecting the habeas petition in that case to the AEDPA one-year time limit). *Rivers* says nothing about relation-back. |

In sum, the Court was able to identify at least one fabricated case, two fabricated quotes, and over a dozen cases and rules utilized to support propositions that they plainly do not support. These hallucinations clearly indicate the use of generative AI in the preparation of the Motion.

Finally, the Court finds that Petitioner did not personally sign or file the Motion. As the Court indicated in its order to show cause, unlike Plaintiff's initial habeas filing, which was signed with a handwritten signature and dated using a pen, his subsequent motions and subsequent filings "bear an *image* of Plaintiff's signature above his name."[28] And as the Court explained then, "Prisoners using a prison computer would not have access to software capable of placing an image of a signature in a submission, nor would Petitioner need to use an image

---

[28] O.S.C., ECF No. 34 at 3. The Court notes that, upon a comprehensive review of the signatures on Petitioner's filings in this case, the initial habeas petition was also likely not signed personally by Petitioner. Of the 18 filings reviewed, most bear one of two signatures: the digital image that also appears on the Motion (e.g., ECF Nos. 10, 11, 17, 20, 23, 29), or what appears to be Petitioner's actual handwritten signature (e.g., ECF Nos. 8, 12–15, 22, 36, 40). The initial habeas petition, by contrast, contains a variant of Petitioner's signature that appears in no other filing, supporting the conclusion that it, too, was submitted by a third party.

of his signature if he were filing the document by his own hand."[29] The Court further notes that, although the envelope containing the Motion listed Petitioner's return address at FCI Big Springs in Texas, where he was incarcerated at the time, the postal stamp indicates it was mailed from Jacksonville, Florida. Petitioner has admitted to the Court that one of the friends assisting him—the friend that runs Nuline—resides in Florida. This further confirms that Petitioner neither drafted, nor signed, nor filed the Motion.

### B. Rule 11 Violations

This case presents an unusual factual scenario. The record shows that Petitioner relied on undisclosed third-party assistance to draft, sign, and file multiple submissions, but it remains unclear who that individual was, whether the person was an attorney, and how many of the filings in this case were generated through artificial intelligence rather than human legal analysis. No case addresses this precise combination of circumstances. Nevertheless, the conduct at issue implicates core Rule 11 concerns: the absence of any personal signature by the filer, the inability to identify who, if anyone, undertook the certification required by Rule 11(b), the use of unverified AI-generated legal content, and Petitioner's affirmative misrepresentations about the nature and extent of the assistance he received. Taken together, these circumstances amount to a serious violation of Rule 11.

First, the Petitioner's filings were not "personally" signed within the meaning of Rule 11(a). As discussed above, the Motion was drafted, signed, and filed by a third party who affixed an image of Petitioner's signature. Where a filing is neither signed by the party nor by any attorney of record, the Court cannot determine who is certifying compliance with Rule

---

[29] *Id.*

11(b). This failure is not a technical defect; it deprives the Court of the ability to identify the individual responsible for ensuring that the filing is not being presented for an improper purpose and that its legal arguments are warranted by existing law or a nonfrivolous modification of it.

The inability to identify the responsible filer also raises the precise concern articulated in *Fengling Liu*: that undisclosed legal assistance "shield[s] the attorney from accountability for his actions" and evades Rule 11's signature requirement. 664 F.3d at 369. If a third party is affixing an image of Petitioner's signature to a pleading, neither the Petitioner, nor the third party, has "personally" signed the pleading under Rule 11(a). If the pleading is not personally signed, the Court cannot determine who is "certif[ying] that to the best of the person's knowledge, information, and belief…it is not being presented for any improper purpose" and does not contain "nonfrivolous argument[s]." And because Rule 60(b) motions "threaten[] serial habeas litigation . . . without rules suppressing abuse, a prisoner could bring such a motion endlessly." *Banister v. Davis*, 590 U.S. 504, 521 (2020).[30]

Although *Fengling Liu* declined to impose discipline in the particular circumstances of that case, it expressly cautioned that ghostwriting may not be accompanied by "affirmative representation[s]" that mislead the Court about the nature or extent of the assistance received. 664 F.3d at 371. Here, Petitioner did just that. He repeatedly represented—both in writing and orally—that the assistance he received was merely "clerical," even though he later acknowledged that a third party drafted pleadings using generative artificial intelligence and

---

[30] O.S.C., ECF No. 34 at 9. See the Court's order to show cause for an in-depth discussion of why ghostwriting has serious Rule 11 implications in the context of Rule 59 and Rule 60 motions. *Id.* at 8–9.

filed these pleadings—including the Motion—directly with the Court on multiple occasions. Although *Fengling Liu* cautioned specifically against affirmative misstatements by an attorney-ghostwriter at the attorney's behest, its reasoning underscores a broader principle: undisclosed legal drafting may not be paired with representations that state the opposite and thus mislead the Court. Regardless of whether the unidentified drafter was an attorney, Petitioner's statements obscured the true nature and extent of the assistance he received. Moreover, because the response to the order to show cause—disclaiming any such assistance—was itself drafted by the third party, those misrepresentations were made at that individual's direction. Thus, this conduct falls squarely within the concerns discussed by the *Fengling Liu* court.

Second, even setting aside the signature defect, the Motion itself violates Rule 11(b)(2). A third party with at least some legal knowledge—and with access to generative artificial intelligence—prepared the Motion and then filed it with the Court on Petitioner's behalf. As a result, Petitioner could not have personally certified the accuracy or legitimacy of the arguments presented. The Court has already identified extensive fabrications throughout the Motion, including nonexistent cases, invented quotations, and legal propositions supported by no real authority. These defects demonstrate that neither Petitioner nor the individual assisting him conducted any "inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b). Instead, the record reflects a complete absence of human verification.

Applying the framework set forth in *Mattox* only confirms the violation. On the first factor—verification and inquiry—the Motion fails entirely. Nothing in the record suggests that Petitioner or the third party helping him conducted even a cursory review of the cited authorities, much less the "human-based verification" that Mattox requires. 2025 WL

3012828, at *5. On the second factor—candor and correction—Petitioner again falls short. Although he eventually disclosed at the October 16 hearing that artificial intelligence had been used, he did not do so in response to the Court's order to show cause or his subsequent reply. To the contrary, he stood firm on the misleading assertion that all assistance was merely "clerical." His failure to correct the record in either of his two written opportunities further aggravates the Rule 11 violation.

Finally, the Court finds Plaintiff acted in subjective bad faith to violate Rule 11 by repeatedly relying on third parties to draft his filings and making misrepresentations to the Court as to the origins of the filings. He directed the third parties to use generative AI and then concealed his actions from the Court when given the opportunity to accept responsibility. At the very least, Plaintiff made "misleading representation[s]" to this Court "for an improper purpose." *Rankin*, 293 F.R.D. at 387. Namely, Petitioner made no personal attempts to check whether his briefs, including those pertaining to the Motion and Order to Show Cause, were accurate. Indeed, several filings were submitted without any personal involvement from him. And Petitioner used these filings to advance his case. Therefore, in line with the approach of other courts in this Circuit, the Court finds that Plaintiff's actions satisfy the subjective bad faith standard and *sua sponte* imposes Rule 11 sanctions.

The combination of undisclosed third-party drafting, misrepresentations to the Court, and pervasive AI-generated hallucinations places this Court in precisely the position Rule 11 is designed to prevent. Without knowing who is actually responsible for the filings, the Court cannot ensure compliance with Rule 11, cannot impose sanctions on the responsible individual, and—particularly in the context of Rule 60(b) habeas filings—risks exposure to serial, abusive litigation. *See* Banister, 590 U.S. at 521. For these reasons, the Court concludes that Petitioner

violated Rule 11(a) and (b), and that the violation is aggravated both by his affirmative misrepresentations and by his reliance on unverified generative artificial intelligence.

The court has available a variety of possible sanctions to impose for Rule 11 violations, including, but not limited to, "striking the offending paper" and "issuing an admonition." Fed. R. Civ. P. 11, advisory committee's note to 1993 Amendments. Here, in the interest of justice and deterrence, it will impose both.

## IV.    <u>CONCLUSION</u>

"The Court will not tolerate pleadings riddled with hallucinated citations masquerading as legitimate legal authority," nor will it tolerate parties who mislead the Court about the origins of their submissions. *Hanson v. Nest Home Lending, LLC*, No. 25-CV-02599, 2025 WL 2959293, at *3 (D. Colo. Oct. 17, 2025). "This conduct undermines the integrity of the judicial process and disrespects and wastes the Court's and parties' time and resources." *Id.* For the foregoing reasons, the Court (1) **ADMONISHES** Petitioner for having a third party draft and file the Motion, which contained multiple fabricated arguments generated by artificial intelligence and affixed an image of his signature, and for his subsequent misrepresentations about the filing to the Court and (2) **STRIKES** the Motion with prejudice.

**SO ORDERED.**

Hartford, Connecticut
November 25, 2025

       /s/Vernon D. Oliver
       VERNON D. OLIVER
       United States District Judge